## AFFIDAVIT

I, Ashan M. Benedict, being duly sworn, depose and state that:

1. I have been employed as Federal Law Enforcement Officer for over 10 years. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) since July 1998. Prior to becoming an ATF Special Agent, I was a Special Agent with the U.S Treasury Department, Internal Revenue Service - Criminal Investigation Division for over 3 years.

2. Since becoming a Special Agent, I have taken part in firearms, gang and narcotic related investigations, and have participated in the execution of numerous search and arrest warrants which have resulted in the recovery of weapons, narcotics and documentary evidence of firearms and armed narcotics trafficking. I have received instruction in illegal possession and interstate trafficking of firearms at the ATF National Academy and received specialized training in the movement of firearms in interstate and foreign commerce. I have investigated firearms traffickers and armed narcotics traffickers while assigned to ATF's High Intensity Drug Trafficking Area (HIDTA) Task Force and federal crimes of violence while assigned to the ATF's Firearms Enforcement Group II Field Office.

3. This affidavit is made in support of in an application for a search warrant for records and documents for the following premises, **1003 P St NW, Washington, DC**, which is described as follows a yellow row house with an enclosed front porch having a security door. The numbers 1003 are displayed on the front door of the residence. This residence is the second house on the north side of the 1000 block of P St.

4. Based on my training and experience, I am aware of the following:

a. Persons who are involved in the distribution of controlled substances commonly make and maintain business records. Specifically, it is quite common for those involved in the manufacture, sale, purchase, and transportation of controlled substances to generate and maintain writings, books, receipts, business ledgers, lists, notations and other memoranda to assist in their criminal enterprise. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate business keep similar materials.

b. Persons who are involved in the distribution of controlled substances will frequently keep materials memorializing past transactions, the status of accounts, inventories, income, and expense records, and the like, all of which are pieces of relevant evidence regarding the question of whether one or more persons possess controlled substances for sale, as well as other legal considerations.

c. Persons who are involved in the distribution of controlled substances typically, possess firearms and/or other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers profits and/or supply of drugs.

5. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal and state law enforcement officers and information obtained from cooperating witnesses. All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations. As to those identified as law enforcement employees, I am aware they have training and experience in criminal investigations, I have worked with them in the past and have found their information to be reliable and accurate. In several instances I have received information from confidential witnesses (CW) and this information is denoted as such in this affidavit. I am aware that each

CW has either given reliable information in the past or that the information they have provided relevant to this investigation has been corroborated through law enforcement or other secondary reliable sources.

6. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me of known to the United States.

7. On or about April 25, 2005 CW1, at the direction and supervision of law enforcement, met with CW2, who at the time was not cooperating with law enforcement, at his/her residence in Front Royal, Virginia during which CW1 purchased approximately 3 grams of suspected crack cocaine from CW2. During the meeting CW2 told CW1 that he/she would introduce CW1 to his/her source of crack cocaine the following week. CW2 stated that his/her source was named "Jimmy" and lived on P Street in Washington, DC. CW1 was searched prior to and following the transaction and no contraband was found. Law enforcement officers field-tested the suspected crack cocaine, which tested positive for cocaine. The suspected crack cocaine has been sent to the DEA Mid-Atlantic Laboratory for further analysis.

8. On or about May 06, 2005 CW1, at the direction and supervision of law enforcement, and CW2, who at the time was not cooperating with law enforcement met with a person whose identity is now known to the undersigned affiant to be James CLARK at his residence **1003 P Street NW, Washington D.C.**, during which CW1 purchased approximately 15 grams of suspected crack cocaine from CLARK. CW2 received approximately 3 of the 15 grams for arranging the transaction. CW1 was searched prior to and following the transaction and no contraband was found. Law enforcement officers field-tested the suspected crack cocaine, which

tested positive for cocaine. The suspected cocaine has been sent to the DEA Mid-Atlantic Laboratory for further analysis

9. On or about May 12, 2005 CW1, at the direction and supervision of law enforcement, and CW2, who at the time was no cooperating with law enforcement, met with CLARK at his residence **1003 P Street NW, Washington D.C.**, during which CW1 purchased approximately 15 grams of suspected crack cocaine from CLARK. CW2 received approximately 3 of the 15 grams of the suspected crack cocaine for arranging the transaction. During the meeting CLARK expressed an interest in obtaining a silver colored .44 Magnum revolver and CW1 told CLARK that he/she might be able to find such a firearm. CW1 was searched prior to and following the transaction and no contraband was found. Law enforcement officers field-tested the suspected crack cocaine, which tested positive for cocaine. The suspected cocaine has been sent to the DEA Mid-Atlantic Laboratory for further analysis.

10. Between on or about May 12 and May 24, 2005 CW1, at the direction of law enforcement, met with CW2, who at the time was not cooperating with law enforcement, on several occasions during which CW1 told CW2 that he/she had a friend who would trade a silver colored .44 Magnum revolver for 7 grams of crack cocaine. According to CW2 he relayed this information to CLARK and CLARK agreed to the trade of crack in exchange for the firearm.

11. On or about May 18, 2005Law enforcement conducted a records search of the District of Columbia Department of Motor Vehicles, which lists Clark's address as **1003 P St NW, Washington, D.C.** Law enforcement officers also obtained a photograph from the District of Columbia Department of Motor Vehicles which CW1 and CW2 have positively identified as Clark

12. On or about May 31, 2005 CW1, at the direction and supervision of law enforcement went CW2's residence to place an order for 18 grams of crack cocaine and to make arrangements for trading a silver colored .44 Magnum revolver to CLARK for 7 grams of crack cocaine.  CW2 stated that he/she and CLARK had discussed the firearm and that CLARK would give the 7 grams of crack cocaine to CW1 and/or CW2 to trade for the firearm.

13. On or about June 02, 2005 CW1, at the direction and supervision of law enforcement, and CW2, who at the time was not cooperating with law enforcement, purchased approximately 24 grams of suspected crack cocaine from CLARK at his residence, **1003 P St NW, Washington, D.C.**  During this meeting CLARK gave CW1 approximately 7 grams of crack cocaine to trade for the firearm.

14. On or about June 2, 2005, CW1, at the direction and supervision of law enforcement, and CW2, who at the time was not cooperating with law enforcement, met with ATF Special Agent (SA) Darin Ramsey, who was acting in an undercover capacity, in the Fair Lakes Shopping Center, Fairfax County, Virginia, which is located within the Eastern District of Virginia.  CW1 gave SA Ramsey approximately 7 grams of suspected crack cocaine (as described in paragraph 13, above) and SA Ramsey gave CW2 a silver colored Smith & Wesson, Model 29-2, .44 Magnum revolver, Serial Number N126524.  CW2 was arrested following this transaction. CW1 was searched prior to and following the transaction and no contraband was found.  Law enforcement officers field-tested the suspected crack cocaine, which tested positive for cocaine.  The suspected crack cocaine will be sent to the DEA Mid-Atlantic Laboratory for further analysis.

15. On or about June 9 and 10, 2005 SA Ramsey and others interviewed CW2 and CW 2, who subsequently entered into a plea agreement with the United States, stated that he/she has

5

known CLARK since approximately1987.  CW2 reported that CLARK has lived at **1003 P St NW, Washington, D.C.**, since the1970's.  CW2 stated that the approximately 3 grams of suspected crack cocaine that he distributed to CW1 on April 25, 2005 was purchased from CLARK.  CW2 told investigators that since September 2004 he/she has purchased crack cocaine from CLARK at his residence 1-2 times per month.

16. On or about June 17, 2005 CW2, at the direction of law enforcement, placed a recorded telephone conversation to Clark, during which CLARK asked CW2 if he (CW2) had traded the crack cocaine for the revolver.

17. On or about June 17, 2005 CW2, at the direction and supervision of law enforcement, met with Clark at his residence **1003 P St NW, Washington, D.C.**  During the meeting CW2 purchased approximately 3 grams of suspected crack cocaine from Clark. Law enforcement officers field-tested the suspected crack cocaine, which tested positive for cocaine.  The suspected crack cocaine will be sent to the DEA Mid-Atlantic Laboratory for further analysis.

18. On or about June 17, 2005 law enforcement conducted a records check on a dark colored van that CW2 knows CLARK to own, District of Columbia license plate number CF1569, which is registered to James W CLARK, **1003 P St NW, Washington, D.C.**

19. Based upon the facts and opinions set forth above, I believe probable cause exists that articles constituting contraband, evidence of the crime, fruits of the crime, instruments of the crime, concerning violations of 21 USC 841(a)(1) distribution or possessing with intent to distribute, a controlled substance and/or 21 USC 846 conspiracy to commit any offense defined in 21 USC 801 et seq, specifically those items set forth in Attachment A, will be found in the residence of James Clark are contained within the premises known as **1003 P St NW, Washington, D.C.**

20. Wherefore, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I respectfully request a warrant to search for documents and records at the premises located at **1003 P St NW, Washington, D.C.**

FURTHER YOUR AFFIANT SAITH NOT.

_____
Ashan M Benedict
Special Agent, ATF

Sworn and subscribed to before me this _____ day of June 2005

_____
United States Magistrate Judge

# **ATTACHMENT A**

1. Crack cocaine, cocaine, marijuana and other illegal controlled substances

2. Paraphernalia for packaging, cutting, weighing and distributing methamphetamine base, including but not limited to, scales, baggies, and cutting agents

3. United States currency in excess of $500.00

4. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

5. Address and telephone books and papers reflecting names, address and telephone numbers

6. Books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashiers checks, the obtaining, secreting, transfer, and concealment of assets in the obtaining, secreting, transfer, concealment and expenditure of money

7. Electronic equipment, such as mobile telephones, telex machines, facsimile machines, telephone answering machines, telephone paging devices, currency counting machines, and any information stored in memory or contained in any related hardware and software

8. Photographs, in particular, photographs of conspirators, of assets, and controlled substances, and other documents identifying associates and conspirators

9. Indicia of occupancy, residence, and ownership of the premises, including but not limited to, utility and telephone bills, canceled envelopes, and keys

10. Any locked or closed container(s) believed to contain any of the above listed evidence.